UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

MARC A. PERGAMENT, as CHAPTER 7
TRUSTEE OF THE ESTATE OF
GERSHON BARKANY,

                    Plaintiff,

        -against-

MARINA DISTRICT DEVELOPMENT CO.,
LLC d/b/a BORGATA HOTEL CASINO & SPA,

                    Defendant.

-----------------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★   **OCT 15 2018**   ★

BROOKLYN OFFICE

**MEMORANDUM & ORDER**

14 CV 2602 (RJD)

DEARIE, District Judge.

     It is a matter of public record and a central allegation in this case that in a June 2013 guilty plea to wire fraud, debtor Gershon Barkany admitted to operating a series of Ponzi-like schemes from approximately December 2009 to March 2013 (the "Ponzi period").[1] A second key allegation, not seriously disputed, is that throughout the Ponzi period, Barkany regularly gambled at the casino operated by defendant Marina District Development d/b/a Borgata Hotel Casino and Spa ("Borgata"). Together, these allegations fuel the fraudulent conveyance claims brought by the plaintiff, the Trustee of Barkany's bankruptcy estate, who seeks to recoup the more than four million dollars that Barkany lost gambling at Borgata during the Ponzi period. The Trustee advances separate claims for constructive fraudulent conveyance under Sections 273-a and 275 of New York Debtor and Creditor Law ("NYDCL"), actual fraudulent

---

[1] See generally *United States v. Barkany*, 13 CR 362 (JLB) (ARL) ECF Docs. 1, 2, 35, 52 (Criminal Complaint, March 27, 2013; Arrest Warrant; Waiver of Indictment and Information, June 25, 2013; and Transcript of Plea Allocution, June 26, 2013. Sentencing is scheduled for October 19, 2018.

conveyance under Section 276 of the NYDCL, fraudulent transfer under Bankruptcy Code (the "Code") §548(a)(1)(A), and unjust enrichment under state law.

Borgata moves under Fed. R. Civ. P. 12(b)(6) to dismiss the action for failure to state a claim. The Trustee cross-moves under Fed. R. Civ. P. 15 for leave to file a Third Amended Complaint ("TAC").

For the reasons detailed below, the Court: (i) grants the Trustee's cross-motion for leave to file the TAC as the pleading subject to 12(b)(6) analysis; (ii) denies Borgata's motion with respect to the Trustee's claims for *actual* fraudulent conveyance under the DCL and fraudulent transfer under the Code (the third and fourth claims for relief in the TAC); and (iii) grants Borgata's motion with respect to the claims for *constructive* fraudulent conveyance under the DCL and unjust enrichment (the TAC's first, second and fifth claims for relief).

## FACTUAL BACKGROUND

### 1. Procedural Context

Although the Trustee's cross-motion presents to the Court the *fourth* iteration of his claims, the underlying allegations and legal theories have not changed materially since this action was first commenced, on or about April 24, 2014, by Barkany Asset Recovery and Management, LLC. ("BARM"). See Complaint, ECF Doc. 1.[2] The parties' shifting positions with respect to important jurisdictional and related procedural matters, however, have reflected a troubling lack of focus and direction.

---

[2] BARM was organized to assist in the recovery, collection and administration of assets stolen by Barkany. See ECF Doc. 17. According to the initial complaint, BARM asserted its claims here as assignee of some of Barkany's victims. ECF Doc 1, ¶ 9.

Within two weeks of filing the initial pleading, BARM filed a first amended complaint, see ECF Doc 5, and Borgata requested a pre-motion conference to address its intent to seek dismissal on the grounds of lack of personal jurisdictional, improper venue, and failure to state a claim. See Def. Letter dated May 30, 2014, ECF Doc. 8. Less than a month later, on June 24, 2014, Borgata filed an Involuntary Chapter 7 Petition against Barkany in the United States Bankruptcy Court for the Eastern District of New York, Case No. 14-72941-845 (the "Chapter 7 Proceeding"). Shortly thereafter, at Borgata's urging, Magistrate Judge Orenstein ruled that the automatic stay provision of the Bankruptcy Code, 11 U.S.C. §362(a)(2), applied to this action. See Electronic Order dated July 16, 2014, referencing motion, ECF Doc. 13, 16. Almost four years later, however, in a joint letter dated April 11, 2018 (ECF Doc. 48), submitted in response to this Court's order to show cause, the parties acknowledged that the automatic stay is *not* applicable to this action. By electronic order dated April 13, 2018, this Court vacated the July 2014 order staying the case.

On or about January 14, 2015, just under seven months after the commencement of the Chapter 7 Proceeding, an order of relief was entered in the Bankruptcy Court with Barkany's consent; the appointment of Marc Pergament as Interim Trustee soon followed.[3] Approximately six months later, on or about June 23, 2015, the Interim Trustee notified the Court of its intention to move under Fed. R. Civ. P. 24 to intervene as co-plaintiff, and upon intervention, to remove this action to the bankruptcy court. ECF Doc. 17. Then-plaintiff BARM consented to the proposed intervention while Borgata opposed; by Memorandum and Order dated August 3, 2015,

---

[3] These events, summarized as background in the Interim Trustee's motion to intervene, ECF Doc. 17, are not disputed.

Magistrate Judge Orenstein rejected Borgata's objections, granted the Interim Trustee's request to file the proposed motion to intervene, and directed the parties to confer on the matter. ECF Doc. 20. Briefing on the motion to intervene ensued. ECF Docs. 21 through 27. While the motion was *sub judice*, however, the parties advised the Court that the Bankruptcy Court had certified the election of Mark A. Frankel as permanent Chapter 7 Trustee of Barkany's estate, and by joint stipulation moved under Fed. R. Civ. P. 25(c) for the substitution of Frankel in place of BARM as plaintiff. See Stipulation filed September 1, 2016, ECF Doc. 29. Magistrate Judge Orenstein so ordered the substitution.

Mark A. Pergament, however, soon succeeded Mark Frankel as permanent chapter 7 trustee, and by stipulation and proposed order filed January 11, 2017, the parties asked that Pergament be included in the caption as an additional plaintiff.[4] ECF Doc. 30. The submission was electronically so ordered the same day. Notably, the stipulation provides that the Trustee "shall promptly file a Notice of Removal with the Clerk's Office to effectuate the removal of this action" to the Bankruptcy Court, while preserving defendant's right to object to the removal. ECF Doc. 30-1.

Thereafter, by letter dated February 27, 2017, the Trustee advised the Court that

---

[4] The record does not connect the dots on this point. Apparently, after Magistrate Judge Orenstein so ordered the stipulation providing that Mr. Frankel be substituted for BARM as plaintiff, the caption was not changed. The paperwork seeking to include Pergament in the caption specifically asks that he be "added" as an "additional" plaintiff along with BARM. Fast forwarding to a conference held on April 21, 2017, counsel for the Trustee fleshed the matter out further: noting that this "has been a difficult case," he reported that Mr. Pergament "was the original interim trustee" but that "[h]e got voted out, which is very unusual," and that Mr. Pergament was appointed successor permanent trustee only after Mr. Frankel, the first permanent trustee, "ended up resigning." (The Court is referencing page 7 of an unfiled draft transcript of the proceedings).

"[u]pon further investigation" the Trustee "ha[d] determined" that the proper means to effectuate the transfer of an action to the bankruptcy court was not, as it had originally believed, the filing of a Notice of Removal, but instead should be a motion to "refer" the action under 28 U.S.C. § 157(a) and this Court's Standing Order of Reference. ECF Doc. 31 at 1.[5] When the parties appeared for a pre-motion conference on April 21, 2017, however, the Trustee reported that he had again reconsidered where this action should be.[6] Without formal legal argument the parties reported their shared view that, under controlling law, the bankruptcy court could do no more than enter proposed findings of fact and conclusions of law on the Trustee's claims, and that, because the case would likely end up back in this Court, they no longer believed referral to the bankruptcy court appropriate or desirable.[7] Further, the Trustee reported that, with Borgata's

---

[5] 28 U.S.C. § 157(a) provides, in pertinent part, that "Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." This Court's Standing Order of Reference dated August 28, 1986 as amended by Order dated December 5, 2012, provides, in pertinent part, "all such cases and proceedings are referred to the Bankruptcy Judges for this District."

Subsequent Supreme Court decisions have held that even though 28 U.S.C. § 157(b) authorized bankruptcy courts to enter final judgment on a class of bankruptcy-related claims that the statute classified as "core," Article III of the Constitution prohibits bankruptcy courts from finally adjudicating certain of those claims because they involved "private rights." Stern v. Marshall, 564 U.S. 462 (2011) (holding that although Bankruptcy Court had statutory authority to enter final judgement on a counterclaim as a core proceeding under 28 U.S.C. §157(b)(2)(C), it lacked constitutional authority to do under Article III); Exec. Benefits. Ins. Agency v. Arkison, 134 S. Ct. 2165 (2014) (holding that, although fraudulent transfer actions are listed in 28 U.S.C. § 157(b) as "core," bankruptcy court has constitutional authority only to enter proposed findings of fact and conclusions of law but not final judgement).

[6] Referenced here is an unfiled draft transcript of the April 21, 2017 proceedings.

[7] Assuming without deciding that, like the fraudulent transfer claims in Exec. Benefits, the Trustee's claims here are the type that the bankruptcy court lacks the constitutional authority to finally adjudicate, the material point here is that *this* Court's jurisdiction is clear. See 28 U.S.C.

5

consent, he intended to file a second amended complaint ("SAC") incorporating additional transfers that had come to his attention.

The Trustee filed his SAC on May 1, 2017, ECF Doc. 35; simultaneously, Borgata filed a letter outlining its intended motion to dismiss on the grounds of lack of personal jurisdiction, improper venue, and failure to state a claim. Def. Ltr., May 1, 2107, ECF Doc. 36. The Trustee's response, by letter dated May 5, 2017, ECF Doc. 38, included a then-recent discovery: a Borgata casino credit application form that Barkany completed in March 2012. ECF Doc. 38 at pg. 4. As will be discussed, because the form contains false or incomplete information, the Trustee relies on the document in arguing that Borgata knew or should have known of Barkany's questionable financial and legal status at the time he gambled at its casino. The parties appeared at a pre-motion conference on May 31, 2017, where the 2012 credit application received considerable attention.[8]

**2.    Threshold Matter:**
       **The Trustee's Cross-Motion for Leave to File the TAC**

The TAC is not offered as a purported cure of the alleged 12(b)(6) deficiencies. Instead, the TAC reflects the Trustee's effort to bring before the Court for purposes of the 12(b)(6) analysis the additional matters that came to light at the time of the pre-motion conference and were discussed in open court at that time (principally, the 2012 credit application and some additional transfers). Borgata argues only that repleading would be futile because the TAC

---

§ 1334 (b) ("...the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11").

[8] At the conference, it was agreed that the challenge to personal jurisdiction would be deferred pending limited discovery on the subject. The challenge to venue, not addressed in the briefs, appears to have been abandoned.

advances the same legal theories as its predecessor (the SAC), but Borgata does not specifically object to Trustee's objective of bringing into the 12(b)(6) analysis allegations relating to the matters already discussed at the pre-motion conference. Finally, the allegations in the TAC that are new do not alter the Court's analysis of the legal issues that Borgata's motion presents for adjudication.

For these reasons, the Court grants the Trustee's cross-motion and accepts the TAC as the pleading now subject to 12(b)(6) scrutiny. See Fed. R. Civ. P. 15(a) ("a party may amend its pleading only with the opposing party's written consent or the court's leave" and "[t]he court should freely give leave when justice so requires"); Rivera v. Harvest Bakery Inc., 13–CV–00691(ADS), 2015 WL 5542386, at *3 (E.D.N.Y. Sept. 18, 2015) ("[the Rule 15(a)] standard is permissive" and "justice does so require unless the plaintiff is guilty of undue delay or bad faith or unless permission to amend would unduly prejudice the opposing party") (internal quotations and citations omitted).

### 3.   The Pertinent Factual Allegations

For purposes of Borgata's 12(b)(6) motion, the TAC is liberally construed, all non-conclusory factual allegations are assumed to be true, and all reasonable inferences are drawn in the Trustee's favor. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); County of Erie, NY v. Colgan Air, Inc., 711 F.3d 147, 149 (2d Cir. 2013). On the other hand, "labels and conclusions," "naked assertions devoid of further factual enhancement" and "legal conclusion[s] couched as factual allegation[s]" are irrelevant for 12(b)(6) purposes. Iqbal, 556 U.S. at 678 (internal quotations and citations omitted). The Trustee's reliance on certain documents referenced in the TAC does not convert the motion to one for summary judgment. See, e.g., Bachayeva v. Americare Certified Special Services, Inc., 2013 WL 1171741, *5 (E.D.N.Y. Mar. 20, 2013) ("on a Rule

12(b)(6) motion to dismiss a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference") (internal quotation and citation omitted).

### A. Barkany's Criminal Conduct

The TAC's narrative incorporates the pivotal events from the Barkany criminal prosecution and related civil and bankruptcy matters. Barkany's criminal activities became the subject of an FBI investigation in or about June 2011; two months later, on or about August 11, 2011—and almost two years before his guilty plea in this Court—Barkany executed an Affidavit of Confession of Judgment (the "Affidavit") in favor of his victims in which he admitted to having defrauded them out of millions of dollars. TAC ¶¶ 27-29. He admitted that he "repeatedly engaged in fraudulent and unauthorized practices" and "employed a variety of means in this fraud, including the solicitation of funds for real estate and loan transactions which, unbeknownst to [the creditors], were not as represented or altogether non-existent." TAC ¶ 30(a). The "loans and real estate transactions were generally shams." TAC ¶30(b). Some of the early transactions did produce returns; when the later transactions did not, Barkany "would resort to reporting fictitious or falsely inflated returns, making some payments and, on certain occasions, trying to get the creditors to roll over payments into new transactions." TAC ¶ 30(d). In reality, however, the investors' money had been used to pay off other creditors "or was otherwise misappropriated" by Barkany. Id.[9]

---

[9] On March 25, 2013, a judgment based on the Affidavit was entered against Barkany and several Barkany-controlled entities referenced in the Affidavit, including Morgan 86, Inc., in the Supreme Court of the State of New York, Queens County. Barkany, the Trustee specifically alleges, is the alter ego of Morgan 86 and other entities. TAC ¶¶ 31-33. On August 14, 2013, that judgment was assigned to BARM, the initial plaintiff in this action; and on April 17, 2017,

According to the Affidavit, Barkany's criminal conduct began in approximately January 2009 and concluded by the end of 2010. The TAC alleges (and the referenced public records confirm), however, that Barkany resumed his criminal activity sometime after his 2011 admissions and continued to engage in fraudulent conduct through approximately March 2013, when he was arrested by federal authorities in this district on charges of wire fraud in violation of 18 U.S.C. §1343. TAC ¶¶ 34-37.

The Trustee alleges that, "[a]fter the original Ponzi scheme concluded," Barkany "devised and implemented additional Ponzi schemes using the same fraudulent methods and devices he had used to defraud his original victims." TAC ¶34. Although the Criminal Complaint and Information contain the same general charge, neither document demarcates, as the TAC does, the conclusion of an original scheme and the resumption of criminal activity through the devising of subsequent schemes. Rather, the Complaint and Information both charge a continuous time period—and, of note, only in the later-filed Information does the time period continue through March 2013. Compare Complaint ¶ 4 (Barkany engaged in criminal conduct "[b]etween January 2009 and December 2010) with Information ¶ 11 (Barkany engaged in criminal conduct "[i]n or about and between December 2009 and March 2013").

The Criminal Complaint specifically charges that Barkany "operated a business in a manner consistent with what is commonly referred to as a 'Ponzi' scheme," which that document defines as follows:

---

as part of the settlement of an adversary proceeding commenced by the Trustee against BARM, the Bankruptcy Court approved BARM's assignment to the Trustee of the Judgment insofar as it is against Morgan 86. TAC ¶¶ 45-48

a fraudulent scheme in which investors are lured to invest money in a business venture with promises of unusually high returns and/or profits from the investment. The high returns and/or profits are represented to investors to be generated by the business ventures themselves. However, in a Ponzi scheme, the vast majority of the money returned to investors is actually money that was obtained directly from successive investors, rather than from the business venture itself. The Ponzi scheme ultimately becomes unsustainable . . . [e]arly investors . . . often receive the promised profits . . . [while] [n]ew investors typically make no profits and, in fact, lose their entire original investment when the scheme ultimately collapses."

Complaint ¶ 2.

The Information, by contrast, does not label Barkany's conduct a Ponzi scheme.

Both instruments, however, charge the same essential criminal conduct, namely, that Barkany induced investors to give him money by representing to them that he would invest their money in real estate that he would later sell for a profit. Complaint ¶ 2, Information ¶ 7. These investment opportunities, however, "did not exist" (Information, ¶ 7) and were entirely "fabricated" by Barkany. Complaint ¶ 2.

Additionally, both instruments incorporate Barkany's gambling activities into the alleged criminal conduct, charging that, "instead" of investing in real estate, he used his investors' money "to pay other investors, donated it to charity, lost it gambling at Atlantic City and otherwise used it for his own profit." Information, ¶ 8. See also Complaint at ¶ 4 (almost verbatim charge). TAC ¶ 38.

When pleading guilty to the single count of wire fraud charged in the Information, Barkany specifically admitted that his criminal conduct spanned the period December 2009 through March 2013. TAC ¶ 40. See Transcript of Plea Allocution, June 26, 3013, 13 CR 362,

ECF Doc 52.[10] Consistent with the charging instruments, Barkany's allocution does not draw a line demarcating the "ending" of an early Ponzi scheme and the commencing of later schemes.

The theme of relapse, however, appears elsewhere. For example, in Barkany's sentencing submission, which this Court can judicially notice, his attorney comments that even after his plea, Barkany resorted to falsifying a signature on a real estate document, an act that counsel describes as an unfortunate "relapse into the impulsive [conduct] and poor judgment that marked his gambling addiction and . . . the scheme that led to his prosecution." Sentencing Memorandum, 13-CR-362, ECF Doc. 103, at 3-4.

## B. The Transfers Alleged to Be Fraudulent Conveyances

The TAC alleges that at Barkany's direction, "[p]roceeds from the Ponzi schemes were transferred" to Borgata throughout the period of Barkany's criminal conduct, *i.e.*, "from no later than December 2009 to March 2013" (defined *supra* as "the Ponzi period"). TAC ¶ 49. The TAC includes a table listing 47 such transfers, by date and amount, totaling $4,669,003.50 (the "Transfers"). TAC ¶ 54. (As a point of reference, bearing on the limitations issue to be discussed *infra* at note 14, approximately ¾ of the Transfers (35 of the 47) occurred more than two years before the June 2014 filing of the Chapter 7 petition date).

The Trustee further alleges, upon information and belief, that "all of the Transfers . . . were made with Ponzi Proceeds," TAC ¶ 51, and "in furtherance of [the] Ponzi scheme." TAC ¶ 9. Specifically, "Barkany made the [t]ransfers in order to seek to continue his gambling

---

[10] Barkany allocuted before Magistrate Judge Arlene R. Lindsay on June 26, 2013. The late Judge Leonard Wexler accepted and approved the plea by Order dated August 7, 2013, 13 CR 362, ECF Doc. 46. As part of his plea, Barkany consented to forfeiture in the amount of $62 million.

activities at [Borgata's] facility, providing him with the chance to win and use his gambling winnings to sustain and continue the Ponzi schemes." TAC ¶ 104. Finally, the Trustee alleges that Borgata "did not provide reasonably equivalent value or fair consideration in return for the Transfers" and that "the Transfers constitute property of [Barkany's] bankruptcy estate." TAC ¶¶ 52-53.

### C. Borgata's Handling of Barkany's Credit Line

The Trustee alleges, upon information and belief, that Barkany began gambling at Borgata in November 2008, when he was 24, and a high school graduate with no record of business activity. TAC ¶ 55. At that time, Barkany completed a credit application, which Borgata approved in the initial amount of $100,000. From December 2009 through February 3, 2011, Barkany transferred $2,140,503.50 "in Ponzi Scheme proceeds" (TAC ¶ 64) to Borgata in order "to cover his gambling losses." (TAC ¶ 64). During this same period, Borgata resorted to collection actions to obtain Barkany's payment of his credit line debt. TAC ¶¶ 55-65.

From that point forward, Borgata "knew or should have known that Barkany had gambling and financial problems." TAC ¶ 68. On March 1, 2011, Barkany executed and filed with the New Jersey Casino Control Commission a Request for Voluntary Exclusion from Casino Gambling (the "Voluntary Exclusion Form" or "Form"). TAC ¶ 66. On the Form, Barkany acknowledged: "I am voluntarily requesting exclusion from all gaming activities at all New Jersey licensed gaming casinos and simulcasting facilities because I am a problem gambler."

The Form offers the option of self-excluding for one year, five years, or life; Barkany chose a year. TAC ¶ 77. When that period ended, in March 2012, Barkany advised Borgata that he wished to resume gambling. TAC ¶ 77. Barkany then completed the casino credit application

referenced earlier bearing the signature of a credit representative dated March 22, 2012. The 2012 application contained pre-printed, outdated information from 2008. TAC ¶ 82, 83. Barkany left the lines for "total gross income" and "total gross assets" blank and entered, falsely, a zero on the line for "indebtedness." TAC ¶ 87, 88; ECF Doc. 38, at 4. The lines for banking information contain the names of two accounts—a joint account with Barkany's wife at HSBC and a business account at Wells Fargo in the name of Morgan 86, the primary entity Barkany used to conduct the original Ponzi scheme—that were closed and inactive. TAC ¶ 86.

Aware that Barkany was a self-identified problem-gambler, Borgata did not seek to verify the information on the 2012 credit application; did not require Barkany to supplement the incomplete application with current financial information; did not conduct a NYSECF search to determine whether Barkany was a defendant in any lawsuits;[11] and did not perform a credit check or other independent creditworthiness investigation. TAC ¶¶ 79-95. Nevertheless, Borgata extended Barkany a credit line of $200,000, twice the size of his pre-exclusion line. TAC ¶¶ 79-95.

According to the TAC, in the next year, (from March 2012 until from Barkany's arrest in early 2013), Borgata increased Barkany's credit line several times without investigating his finances. TAC ¶ 96. Some of Barkany's wire-transfers to Borgata came from bank accounts other than the two listed on the 2012 credit application; one was sent from his attorney's account to create the impression that Barkany was a successful businessman. TAC ¶¶ 97-100.

---

[11] In this respect, the TAC alleges that on September 14, 2011, BARM commenced a lawsuit against Barkany's former attorneys in the New York state courts in which the pleadings aver that the case "arises from a massive Ponzi scheme perpetrated by Gershon Barkany," and that in January 2012, Barkany was named as a third-party defendant in another New York action in which the papers refer to the "fraudulent scheme perpetrated solely by Barkany." TAC ¶¶69-72.

In sum, the TAC concludes, at the time of the Transfers, Barkany was insolvent, or was rendered insolvent as a result of the Transfers; his gambling losses at Borgata during the Ponzi period far exceeded his winnings; Barkany did not received bona fide consideration in exchange for the Transfers; and Borgata did not receive the Transfers in good faith. TAC ¶¶ 103-108.

## DISCUSSION

### RULE 12(b)(6) STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft, 556 U.S. at 678 (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. There is no litmus test: "[d]etermining whether a complaint states a plausible claim" is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." Id. In general, plausibility is understood as lying between probability and mere possibility. Id. at 678 ("The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."). To survive at 12(b)(6), the Trustee must "nudge[ ] [his] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570. The dispositive question is whether, "constru[ed] liberally" with "all reasonable inferences [drawn] in the plaintiff's favor," County of Erie, 711 F.3d at 149 (internal quotation and citation omitted), the TAC pleads enough factual content "to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

14

# EVALUATION OF THE TRUSTEE'S CLAIMS

## I.    The Actual Fraud Claims

As noted, the Trustee brings claims for actual fraudulent conveyance under DCL § 276 and fraudulent transfer under Code § 548(a)(1)(A). The central element of these claims, as now discussed, is the debtor's *actual* intent to hinder, delay or defraud creditors.

## A.  Governing Statutory Provisions

Section 548(a)(1)(A) of the Code provides, in relevant part:

> The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation incurred by the debtor that was made or incurred on or with in 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) made such transfer or incurred such obligation *with actual intent to hinder, delay, or defraud* any entity to which the debtor was or became, on or after the date that such transfer was made or obligation was incurred, indebted[.]

11 U.S.C. § 548(a)(1)(A) (emphasis added).

Section 550 of the Code provides, in relevant part:

> to the extent that a transfer is avoided under [section 548], the trustee may recover for the benefit of the estate, the property transferred, or, of the court so orders, the value of the property, from—
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

NY DCL §§ 276 and 278 authorize similar relief. Section 276 provides:

> Every conveyance made and every obligation incurred with *actual intent*, as distinguished from intent presumed in law, *to hinder, delay, or defraud* either present or future creditors, is fraudulent as to both present and future creditors.

Section 278 authorizes defrauded creditors to seek to "set aside" conveyances that section 276 declares fraudulent. Unlike the Code, however, the DCL allows the setting aside of transfers made up to six years (rather than only two years) before the bankruptcy petition was filed. See Schneider v. Barnard, 508 B.R. 533, 541 (E.D.N.Y. 2014) (Bianco, J.) (collecting authorities).[12]

Finally, under both the DCL and the Code, the nature of the *transferee*'s state of mind can be a bar to avoidance of an otherwise fraudulent conveyance; the DCL refers to a transferee's "knowledge of the fraud" whereas the Code speaks more generally of "good faith." See NY DCL § 278(1) (creditor as to whom a conveyance is fraudulent may have the conveyance set aside "as against any person *except a purchaser for fair consideration without knowledge of the fraud* at the time of the purchase") (emphasis added); 11 U.S.C. § 548(c) (even if a transfer is voidable, "a transferee that *takes for value and in good faith* may retain any interest transferred to the extent that such transferee gave value to the debtor in exchange for such transfer or obligation") (emphasis added).

---

[12] See Schneider, 508 B.R. at 542 ("Although the New York statute of limitations for fraudulent conveyance actions allows a creditor to recover transfers made six years before the filing of the *complaint*, it is well established that once a bankruptcy petition is filed, section 546(a) of the Code is triggered, allowing a trustee to recover transfers made six years before the *petition date*." (internal quotation and citation omitted).

The parties did not address the limitations issue. Nevertheless, it is clear that the 35 transfers that occurred between and including January 7, 2010 and June 4, 2012 (see TAC ¶ 54) would *not* be actionable under Bankruptcy Code § 548(a)(1)(A) because they were made more than two years before the petition date (June 14, 2014). All 47 Transfers, however, occurred with the six-year limitations period applicable to the DCL § 276 claim.

## B. The "Ponzi Scheme Presumption"

In Borgata's view, to characterize the Transfers as fraudulent conveyances is simply misguided as a matter of law and common sense. The credit relationship between a New Jersey casino and its patrons, as Borgata explains, is entirely a creature of state law, see generally N.J.A.C. §19.45 et seq (New Jersey Division of Gaming ("DGE") regulations), and there is no allegation that the Transfers contravene that law.[13] By repaying the credit Borgata extended to him, Borgata urges, Barkany was not defrauding creditors, but simply *paying one of them*. Put differently: for purposes of fraudulent conveyance analysis, Borgata urges, it should be treated as the equivalent of Barkany's grocery store, utility provider or any other legitimate business that in exchange for fair consideration—*i.e.*, goods or services provided—was paid by Barkany with Ponzi proceeds. The consideration here, which the Trustee does not dispute, is the undisputed entertainment value of gambling.[14]

The Trustee, in defense of his claims, relies on settled Second Circuit jurisprudence (to be discussed) in asserting that the Transfers are presumptively fraudulent because they were made during the operation of the Ponzi schemes and "in furtherance of" those schemes. He further

---

[13] While not within the four corners of the complaint, the nature of the credit relationship and the governing regulations can be judicially noticed for purposes of the 12(b)(6) motion. In general, in order to draw on a casino line of credit, a patron requests a "marker" for a specified amount. This "marker" is a counter check, generated by the casino, with the patron's banking information, including ABA routing number, and made payable to the casino; upon issuance (at either the gaming table or the casino cashier), the patron signs the check, which is held as security against the repayment of the credit. The regulations require that all markers in excess of $5,000 be repaid within 45 days; if the payment is not made, the casino is required to deposit the marker in satisfaction of the liability.

[14] Barkany also invokes the statutory bars to recovery in arguing that, regardless of Barkany's fraud, Borgata was an innocent party who received without knowledge of the fraud (under DCL § 276) and in good faith (under Code § 548(c). This branch of the motion is issue is discussed separately in Part I.C, *infra*.

17

asserts that this presumption is enough to get him past 12(b)(6). Borgata "concedes [that] there

is a general rule that a Ponzi scheme demonstrates actual intent to hinder, delay, or defraud

creditors as a matter of law." Def. Mem., ECF Doc. 42-1 at 7, but argues that the rule is

inapplicable to the Transfers because Borgata is not an alleged victim of Barkany's schemes.

> The settled law plainly supports the Trustee's position.

> The debtor's operation of a Ponzi scheme is strong circumstantial
> evidence of the debtor's actual intent to hinder, delay, or defraud creditors.
> Indeed, transfers made by a Ponzi entity are presumed to have been made
> with actual intent to hinder, delay or defraud creditors under the relevant
> Bankruptcy Code provisions and applicable New York Debtor and
> Creditor law. This Ponzi scheme presumption, according to which the
> existence of a Ponzi scheme establishes that transfers were made with the
> intent to hinder, delay and defraud creditors, is well recognized by courts
> in this Circuit and elsewhere.

Schneider, 508 B.R. at 542 (reviewing the jurisprudence) (internal quotations and citations

omitted).

> Notably, this presumption (at least as this Court understands the jurisprudence) is far

from a strained legal construct; rather, as Schneider explains, the presumption appropriately

reflects the inevitable unsustainability of Ponzi schemes:

> [t]The rationale for the Ponzi scheme presumption derives from the nature
> of a Ponzi scheme itself, A Ponzi scheme is any sort of fraudulent
> arrangement that uses later acquired funds or products to pay off previous
> investors…Because the investor pool is a limited resource and will
> eventually run dry, the Ponzi scheme operator must know all along, from
> the very nature of his activities, that investors at the end of the line will
> lose their money. Accordingly, when a Ponzi scheme transfers funds out
> of the Ponzi scheme, only one inference is possible, namely, that the
> debtors had the intent to hinder, delay or defraud creditors.

Id. (internal citations, quotations, and alterations omitted).

> With respect to the presumption, the only question Borgata's motion presents is whether

to declare the principle *in*applicable to the Transfers solely because Borgata was not one of the

investors in the stream feeding the Ponzi cycle.  In Borgata's view, logic and caselaw dictate that the presumption apply only to "transfers that make the investment look profitable in order to attract future investors and thereby 'further the Ponzi scheme." Def. Mem., ECF Doc 42-1, at 8. Id.  Since Borgata was not an investor, the Transfers did not contribute to the signature Ponzi falsity, *i.e.*, the fraudulent appearance of profitability needed to attract new investors.

Borgata's position, however, rests on an on unduly narrow construction of the term "Ponzi scheme" and the eponymous presumption, as the controlling caselaw shows.  First, as explained by Bankruptcy Judge Burton R. Lifland, writing in one of the many decisions in the Manhattan Investment Fund litigation in the Southern District (cited heavily yet selectively by both parties here):

> When a debtor operating a Ponzi scheme makes a payment with the knowledge that future creditors will not be paid, that payment is presumed to have been made with actual intent to hinder, delay or defraud other creditors—*regardless of whether the payments were made to early investors, or whether the debtor was engaged in a strictly classic Ponzi scheme.*

In re Manhattan Inv. Fund Ltd., 310 B.R. 500, 509 (Bankr. S.D.N.Y. Oct. 7, 2002) (emphasis added).  A subsequent district court opinion in the same litigation held similarly.  See In re Manhattan Inv. Fund Ltd., 397 B.R. 1, 12 (S.D.N.Y. 2007) (explaining that "there is no precise definition of a Ponzi scheme and [that] courts look for a general pattern, rather than specific requirements," and that the label Ponzi "applie[s] to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud") (internal quotation and citation omitted).

Indeed, in that case, the district court affirmed the bankruptcy court's application of the Ponzi presumption to transfers that a hedge fund made to its broker-maintained margin account—which included funds used to open new trading positions, to support open positions, and to keep the account operational; none were payments to investors. 397 B.R. at 13.[15]

The point is further illustrated by In re C.F. Foods, 280 B.R. 103 (Bankr. E.D. Pa. 2002), where the bankruptcy court applied the presumption to transfers made by a Ponzi scheme operator *to a charity*. See id., 280 B.R. at 111-112. The court reasoned that, "[i]n perpetrating the Ponzi scheme, [the debtor] had to know that the monies from investors would eventually run out and that the payments to charities would contribute to the eventual collapse of the stratagem," and that "[k]nowledge that future investors will not be paid is sufficient to establish actual intent to defraud them." Id. at 111 (internal citation omitted). Cf. In re Armstrong, 285 F.3d 1092 (8th Cir. 2002) (trustee successfully avoided, on an actual fraud theory under section 548(a)(1) of the Code, transfers made by a Ponzi scheme operator to Harrah's casino to cover his gambling expenses and debts).[16]

---

[15] The entity at issue in Manhattan Fund Investment's was a hedge fund, engaged in the ultimately unprofitable short selling of technology stocks in the late 1990's. Fund manager Michael Berger hid the fund's growing losses by fraudulently misrepresenting to new investors that the fund was profitable by concealing its financial status from brokers, auditors and other service providers. The Court held that the fund was a Ponzi scheme because, despite the many directions in which funds flowed, Berger ultimately "sought to cover losses from ill-advised short sales …with deposits made by new investors." 397 B.R. at 12.

[16] Of note, the Ponzi scheme presumption was not invoked in Armstrong. Instead, the bankruptcy court made findings of actual fraud after a hearing at which the debtor, attorney Murray Armstrong, testified. The testimony revealed that Armstrong obtained funds "through numerous fraudulent methods, including his Ponzi schemes, check kiting, and embezzlement from his clients." In re Armstrong, 231 B.R. 739, 742 (Bankr. E.D. Ark. 1999). The relationship between his gambling and his Ponzi schemes was not clearly demarcated: the court observed that "[a]lthough [Armstrong] may have been 'driven' to gamble and to obtain funds to cover his

These cases also illustrate that one component of Borgata's position *is* correct: namely, that the presumption of intent to defraud creditors is triggered only when the transfers sustain or advance the Ponzi scheme in some way.[17] The rub for Borgata, however, is that the allegations here, appropriately tracking the theory charged in the criminal complaint to which Barkany pled guilty, cast the Transfers in precisely this way, *i.e.*, as having been made in furtherance of Barkany's ongoing Ponzi activity. See TAC ¶ 51, 9 ("all of the Transfers . . . were made with Ponzi Proceeds…in furtherance of [the] Ponzi scheme").

Importantly, the TAC does more than merely recite the Barkany prosecutors' theory—a gesture that might be susceptible to attack as a "mere conclusion" not entitled to weight in the 12(b)(6) analysis—but also spells out concretely just how the Transfers did (or could) further the Ponzi scheme: "Barkany made the Transfers in order to seek to continue his gambling activities at [Borgata's] facility, providing him with the chance to win and use his gambling winnings to sustain and continue the Ponzi schemes." TAC ¶ 104. In short, the TAC alleges that Barkany resorted to a potential source *other than* later investors to seek to raise the money necessary to keep his scheme going. This is neither conclusory nor fanciful but plainly plausible within the meaning of Iqbal. It is therefore also sufficient under the cited authorities to trigger application

---

illegal schemes, in fact he knew at the time he placed the bets that he could not win sufficient funds to cover his gambling losses and Ponzi schemes." Id. at 743.

[17] To be sure, the required nexus between the scheme, and the transactions to which the presumption of fraudulent intent applies, has not been articulated consistently. See Schneider, 508 B.R. at 543 (collecting cases). The presumption has been applied to "almost all transfers made by a Ponzi entity;" to transfers that "bear some connection to" the scheme, are "made in connection with" the scheme, or are "in furtherance of the scheme;" but not to transfers that "are unrelated to" the scheme. Id. (internal citations and quotations omitted).

of the presumption that, in so doing, Barkany intended to hinder the ability of some of his investor-victim-creditors to collect what he owed them.

To be sure, the allegations also give rise to a range of other inferences. It may be, for example, that Barkany gambled not specifically to cover Ponzi scheme obligations but with a reckless disregard for the fact that he was putting funds owed to his victims at risk—a set of facts that would also justify, post hoc, application of the Ponzi presumption at this stage. The truth may also turn out to be, as Borgata asks the court now to infer, the opposite: *i.e.*, that Barkany resorted to criminal activity in order to fund a gambling addiction. These, however, are considerations for another day: at this stage, the Court draws all reasonable inferences in the Trustee's favor. Iqbal, 556 U.S. at 678; County of Erie, 711 F.3d at 149.

**C.** **The Bars to Recovery: "Knowledge of the Fraud" (DCL § 278(1)) and "Good Faith" (Code § 548(c)).**

Borgata argues that, even if the presumption establishes fraudulent intent on Barkany's part for 12(b)(6) purposes, the Trustee's claims must nevertheless be dismissed because Borgata is an innocent recipient; the argument takes a slightly different tack under the DCL (which, as noted, refers to "knowledge of the fraud") and the Code (which uses the term "good faith").

In the DCL § 276 context, Borgota argues that the transferee's knowledge of the transferor's fraud is an essential element that it is the Trustee's burden to adequately plead and prove. Borgata says that the TAC's conclusory recitation that it (Borgata) knew or should have known of Barkany's criminal conduct is not enough to survive 12(b)(6) because several allegations *preclude* any bona fide, plausible inference to that effect. For example, although Barkany initially admitted to operating a Ponzi scheme in the August 2011 Affidavit of Confession of Judgment in favor of BARM (TAC ¶ 28-30), BARM did not make that document

22

public, by filing it in court, until March 25, 2013 (TAC ¶31)—which is *after* the last of the Transfers occurred. See TAC ¶ 54 (the Transfers occurred between January 7, 2010 and March 13, 2013). Similarly, it was not until the end of March 2013—again, *after* the last of the Transfers—that the federal criminal charges against Barkany were filed. (TAC ¶35). Since it is not alleged that Borgata was an actual co-conspirator of Barkany's, Borgata emphasizes, there is simply no basis for inferring the requisite actual or constructive knowledge.

The same theme fuels Borgata's argument that it received "in good faith" within the meaning of Code § 548(a), except that Borgata appears to concede that good faith under the Code is an affirmative defense on which it, rather than the Trustee, bears the burden. Borgata appears to argue, however, that the absence good faith can nevertheless be the basis for dismissal here because the Trustee has elected to address the subject and because the pleading fully presents the facts essential to the defense. See, e.g., Bachayeva, 2013 WL 1171741, at *5 ("dismissal under Rule 12(b) (6) on the basis of an affirmative defense is appropriate . . . if the defense appears on the face of the complaint") (internal quotation and citation omitted).

Although Borgata's cry of "innocent transferee" has some equitable appeal under the circumstances alleged, once again the controlling law supports the Trustee: at the 12(b)(6) stage, a transferee's good faith (under Code §548(c)) and lack of knowledge of the fraud (under NY DCL §278) are fact-intensive, affirmative defenses that need not and should not be reached at the 12(b)(6) stage. See, e.g., Gowan v. The Patriot Group, LLC (In re Dreier LLP), 452 B.R. 391, 401 et seq. (Bankr. S.D.N.Y. 2011) (aware that "some defenses may be appropriately considered at the motion to dismiss stage," nevertheless holds that, in fraudulent conveyance actions, "consideration of defendants' good faith sufficient to make out an affirmative defense under § 548(c) of the [ ]Code or NYDCL § 278 (1) is *not* appropriate at the motion to dismiss stage")

(emphasis added) (collecting cases); Schneider, 508 B.R. at 545-547 (holds that "the Bankruptcy Court correctly decided that DCL § 276 requires only proof of the transferor's fraudulent intent; the transferee's intent is relevant only to a good faith defense [and] finds the Dreier decision particularly persuasive on this issue").[18] Accord Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC), 458 B.R. 87, 105 (Bankr. S.D.N.Y. 2011) ("because section 278 is an affirmative defense, the transferee's intent should be considered on a full evidentiary record...consequently, for the purposes of a motion to dismiss, the trustee need state with particularity only the circumstances constituting the fraud and allege the requisite actual intent by the transferor to hinder, delay, or defraud"). In asserting that a transferee's knowledge of the transferor's fraud is an essential element that it is the Trustee's burden to plead, Borgata neither addresses these cases nor offers *any* authority in support.

Further, as a practical matter, the Court finds Dreier instructive because there, as here, "the dispute . . . centers on the Trustee's argument that the Defendants knew or should have known that the transfers were made with tainted funds." 452 B.R. at 426. The bankruptcy court concluded that "[d]etermining the Defendants' good faith is an indisputably factual inquiry to be undertaken by the Court after the close of discovery and need not be resolved at the motion to dismiss stage" and, therefore, "[i]t is simply not the Trustee's burden at this stage of the case to counter the Defendants' declaration of good faith." Id. Borgata's claim here is likewise intensely factual—and, at this stage, speculative absent a factual record. For example, by

---

[18] Schneider recognizes that courts have not ruled consistently on this question, see 508 B.R. at 546, but relies heavily on the reasoning of Dreier for several reasons detailed at length in the opinion. See id. at 546-547. This Court is similarly persuaded for similar reasons.

Borgata's own account, the markers it issued Barkany included his bank routing number, which is information presumably furnished on his credit application. Arguably, it should have come to Borgata's attention, when it deposited Barkany's markers, that Barkany's credit application contained false information. Borgata, however, says that it, too, is a victim, defrauded by Barkany, and that nearly $250,000 in credit extended to him remains unpaid. The point is that these issues must await factual discovery.[19]

## D. Particularity Under Fed. R. Civ. P. 9(b).

Allegations of fraud of course must satisfy a heightened pleading standard. See Fed. R. Civ. P. 9 (b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake"). Rule 9(b) is "designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." U.S. ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 26 (2d Cir. 2016). Rule 9(b) typically requires a plaintiff alleging fraud to identify the specific statements alleged to be fraudulent as well as who made them, when, where, and why. Ladas, 824 F.3d at 25.

---

[19] Further still, neither "knowledge" under the DCL or "good faith" under the Code is clearly defined and may require further clarification post-discovery. See, e.g. Dreier, 452 B.R. at 445-447 (noting that "[t]he Second Circuit has recognized that the question of 'good faith' under the NYDCL is 'an elusive concept,'" that "the [ ] Code does not defines 'good faith' as used in § 548," and that the question "under both the NYDCL and the [ ] Code ha[s] been the subject of wide-ranging debate among courts and commentators") (internal citations and quotations omitted) (collecting authorities).

Here, because the Ponzi scheme presumption satisfies the Trustee's pleading burden with respect to intent, all that 9(b) requires is that he specify the date and amount of the transactions alleged to be fraudulent conveyances, and this he has done. See TAC ¶ 54.

## II. Constructive Fraudulent Conveyance Under DCL § 273 and 275

### A. Governing Statutory Provisions

Section 273-a of the DCL provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without fair consideration. (DCL § 273-a).

See generally HBE Leasing Corp. v. Frank, 48 F.3d 623, 633 (2d Cir. 1995) ("HBE Leasing I") (labelling the fraud "identified by DCL § 273-a" as a type of "constructive fraud," because, if the statutory conditions are met, a transfer can be deemed a fraudulent conveyance "*regardless of the intent of the transferor*") (emphasis added).

Section 275 of the DCL, while taking some account of the transferor's intent, also turns on fair consideration; it provides:

> Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay them as mature, is fraudulent as to both present and future creditors. (DCL § 275)

"Fair consideration," in turn, is defined by DCL § 272:

> Fair consideration is given for property, or obligation,
>
> a. When in exchange for such property, or obligation, as a fair equivalent therefor, *and in good faith*, property is conveyed or an antecedent debt is satisfied, or
>
> b. When such property, or obligation *is received in good faith* to secure a present advance or antecedent debt in amount not

26

> disproportionately small as compared with the value of the
> property, or obligation obtained.  (DCL § 272, emphasis added).

See generally Sharp Int'l Corp. v. State Street Bank & Trust Co., 403 F.3d 43, 53 (2d Cir. 2005)

(summarizing these and related New York provisions).

## B.    Controlling Jurisprudence

*Constructive* fraud, for fraudulent conveyance purposes, is a horse of a different color.

With the focus shifting from the intent of the transferor to the question of fair consideration

(which, by statute, includes the transferee's good faith), the law supports Borgata's position here.

As an initial matter, it is clear that DCL § 272 means what it says: in contrast to its status

in *actual* fraudulent conveyance jurisprudence, "good faith" on the part of the transferee *is* an

element of a *constructive* fraudulent conveyance claim.  See Sharp, 403 F.3d at 53, 54 n.4 ("[t]he

fair consideration test is profitably analyzed as follows: (1) ... the recipient of the debtor's

property must either (a) convey property in exchange or (b) discharge an antecedent debt in

exchange; and (2) such exchange must be a fair equivalent of the property received; and (3) such

exchange must be in good faith," noting that "'[g]ood faith' in a constructive fraudulent

conveyance claim is the good faith of the transferee.").  Accord Dreier, 452 B.R. at 442 ("Under

New York law, the party seeking to have the transfer set aside [as constructively fraudulent]

bears the burden of proof on the element of fair consideration and, since it is essential to a

finding of fair consideration, good faith") (internal quotation and citation omitted).[20]

---

[20] Dreier, taking the analysis a step further, observes that in seeking to establish a lack of "fair consideration," a trustee may seek to establish *either* the lack of "fair equivalent value" for the transfer *or* the lack of good faith on the part of the transferee.  452 B.R. at 442-443. As noted, the Trustee is not disputing that the gambling entertainment experience Borgata provided Barkany was "fair equivalent value."  The only issue presented, therefore, is Borgata's good faith.

Without reaching the question of whether "good faith" as an element of "fair consideration" for constructive fraud might differ in scope from "good faith" in the actual fraud context, the Court concludes that the constructive fraudulent conveyance claims here must be dismissed because binding Second Circuit precedent forecloses the precise theory of lack of good faith on which the Trustee relies.

First, as a general matter, the Circuit reminds us that, "[u]nlike the [ ] Code, the [NYC DCL] is a set of legal rather than equitable doctrines, whose purpose is not to provide equal distribution of a debtor's estate among creditors, but to aid specific creditors who have been defrauded by the transfer of a debtor's property [and] does not bestow a broad power to reorder creditor claims or to invalidate transfers that were made for fair consideration . . . where no actual intent to hinder, delay, or defraud creditors has been shown." HBE Leasing I, 48 F.3d at 634. Further, "even the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because the basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy some of his creditors; it normally does not try to choose among them." Id. (internal quotation and alteration omitted).

Second, aware that "some New York cases have broadly construed the reference to "good faith" in DCL § 272's definition of 'fair consideration,'" while "other authorities have cautioned against an expansive reading of the [DCL]'s reference to good faith," the Circuit discouraged efforts "to assert lack of good faith" as an "independent ground" for voiding transactions. HBE Leasing I, 48 F.3d at 636. A decade later, in Sharp, the Circuit re-affirmed that good faith is a distinct element of the definition of fair consideration while acknowledging

28

that "[g]ood faith is an elusive concept in New York's constructive fraud statute." *Sharp* 403 F.3d at 54.

Relevant here, however, the Circuit in *Sharp* squarely rejected the approach to good faith/lack of knowledge on which the Trustee's constructive fraudulent conveyance claims rest. Reviving the teaching of HBE Leasing I that the "[t]he basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy some of his creditors" and that "it normally does not try to choose among them," 403 F.3d at 54, *Sharp* further explained: "[n]or it does it matter that the preferred creditor knows that the debtor is insolvent." *Id.*

In that case, Sharp argued that certain transfers to State Street Bank were constructively fraudulent because "State Street knew that the funds used to repay the State Street debt were fraudulently obtained." *Id.* at 55. The Circuit found Sharp's theory "unpersuasive," *id.*, and adopted the following as Circuit law:

> a lack of good faith does not ordinarily refer to the transferee's knowledge of the source of the debtor's monies which the debtor obtained at the expense of other creditors. . . to find a lack of "good faith" where the transferee does not participate in, but only knows that the debtor created the other debt through some form of dishonesty is to void the transaction because it amounts to a kind of "preference"—concededly a most undesirable kind of preference, one in which the claims of alternative creditors differ considerably in their moral worth, but a kind of preference nonetheless.

*Id.* at 55 (internal quotations and citations omitted).[21]

The panel in *Sharp* was emphatic: it reiterated that:

---

[21] *Sharp* also explained that the rule it adopted was not inconsistent with its "observation in *HBE Leasing I* that 'the statutory requirement of "good faith" is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme"—language on which the Trustee relies here. *Sharp* explains that *HBE Leasing I*'s discussion was limited to its unique facts, which involved the "collapsing of multiple transactions" that were treated as "phases of a single transaction." *Id.* at 55 (internal quotations omitted).

> Sharp has alleged State Street's knowledge that the funds used to repay the preexisting debt were fraudulently obtained. New York fraudulent conveyance law, however, is primarily concerned with transactions that shield company assets from creditors, not the manner in which specific debts were created. . . State Street's knowledge of the [transferors'] fraud, without more, does not allow an inference that State Street received the $12.25 million payment in bad faith.

Id. at 55-56 (internal citation and quotation omitted).

The Trustee's position here is materially indistinguishable from the theory rejected, as a matter of law, in Sharp.[22] As a result, the TAC cannot be reasonably be construed to allege lack of fair consideration, an essential element of constructive fraudulent conveyance. Accordingly, the Trustee's claims for constructive fraudulent conveyance are dismissed.[23]

## 3. Unjust Enrichment

To prevail on a claim of unjust enrichment, a party must show that (1) the other party was enriched, (2) at that party's expense and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered. Paramount Film Distrib. Corp. v. State of New York, 30 N.Y.2d 415, 421 (1972), cert. denied, 414 U.S. 829 (1973). The allegations preclude recovery under this theory because, as noted, there is no allegation that the credit relationship between Barkany and Borgata was itself unlawful, or that Borgata did not have a prima facie entitlement to be paid for the credit it lawfully extended. The separate issue

---

[22] As noted previously, there has been no allegation or suggestion that Borgata participated in Barkany's criminal activity. See Sharp, 403 F.3d at 55 (lack of good faith under DCL § 272 not shown "where the transferee *does not participate in*, but only knows that the debtor created the other debt through some form of dishonesty...") (emphasis added).

[23] As a final word: it is not clear that there is any reason the Trustee needs to proceed on parallel theories of constructive and actual fraud. Notably, between the SAC and the TAC the Trustee elected to withdraw his claim for constructive fraudulent transfer under the Bankruptcy Code.

of whether the Transfers are voidable after the fact under fraudulent conveyance law does not trigger the concerns of conscience that trigger a bona fide claim for unjust enrichment.

## CONCLUSION

For the reasons discussed: (i) the Court grants the Trustee's cross-motion for leave the file the Third Amended Complaint as the pleading subject to Rule 12(b)(6) analysis; (ii) the Court denies Borgata's motion to dismiss with respect to the third and fourth causes of action (*i.e.*, those pleading *actual* fraud under NY DCL §276 and Code § 548(a)(1)(A)); and (iii) the Court grants Borgata's motion to dismiss the first, second and fifth causes of action (*i.e.*, the claims for *constructive* fraud under NY DCL §§ 273-a and 275 and for unjust enrichment). It is the Court's hope that the zealously requested discovery will give this proceeding the focus it has been lacking.

SO ORDERED.

Dated: Brooklyn, New York
      October *11*, 2018

s/ RJD

RAYMOND J. DEARIE
United States District Judge